**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
AT CLARKSBURG**

**JACKLIN ROMEO, SUSAN S. RINE,
and DEBRA SNYDER MILLER, individually
and on behalf of all others similarly situated,**

    **Plaintiffs,**

v.                                                            **Civil Action No. 1:17-CV-88
                                                                    Hon. Judge Irene M. Keeley**

**ANTERO RESOURCES CORPORATION,**

    **Defendant.**

**ANTERO RESOURCES CORPORATION'S REPLY
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**I.     INTRODUCTION**

Antero[1] is entitled to summary judgment because Plaintiffs cannot prove either breach or damages, two essential elements of their breach of contract claim. First, Antero has not breached the Class Leases or various modifications thereto, because they authorize Antero to take deductions using the "work-back" method to determine the value of gas at the wellhead. The Class Leases are market value leases, not proceeds leases like in *Wellman* and *Tawney*. Even if those cases were not expressly so limited, *Young* and other cases counsel against extending their reach. In addition, contrary to Plaintiffs' unsupported argument, all of the lease modifications identified by Antero contain operative royalty provisions, which clearly apply to authorize the "work-back" method as well. Second, Plaintiffs cannot prove damages under any theory because Antero has paid Plaintiffs more royalties than required by paying on the wellhead volume and MMBtu value of the gas rather than actual sales volumes, and Plaintiffs have benefitted from Antero's NGL upgrade. Therefore, this Court should grant Antero's motion for summary judgment.

---

[1] Unless otherwise indicated, abbreviations and defined terms used in this brief correspond to the abbreviations and defined terms used in the memorandum in support of Antero's motion for summary judgment.

## II.     ANTERO IS ENTITLED TO SUMMARY JUDGMENT

Antero is entitled to summary judgment on Plaintiffs' breach of contract claim because as a matter of law Antero has not breached or violated its duties under the Class Leases or modifications thereto, and Plaintiffs and the Certified Class have not been injured. Plaintiffs do not dispute that, under *Richards v. EQT Production Co.*, No. 1:17cv50, 2018 WL 3321441 (N.D. W. Va. July 5, 2018), Antero needs only to establish the inverse of at least one of the elements of a breach of contract claim in order to prevail on summary judgment. *Id*. at *3. Antero has established the inverse of two elements.

### A.     Antero Has Not Breached or Violated Its Duties Under the Class Leases.

Antero has not breached the Class Leases because they are not proceeds leases governed by *Wellman v. Energy Resources, Inc.*, 210 W. Va. 200, 557 S.E.2d 254 (2001), and *Tawney v. Columbia Natural Resources, LLC*, 219 W. Va. 266, 633 S.E.2d 22 (2006). Instead, the Class Leases are market value leases governed by *Imperial Colliery Co. v. Oxy USA Inc.*, 912 F.2d 696 (4th Cir. 1990), which authorizes Antero to calculate royalties using the "work-back" method explained recently in *Young v. Equinor USA Onshore Properties, Inc.*, 982 F.3d 201 (4th Cir. 2020), and *Leggett v. EQT Production Co.*, 239 W. Va. 264, 800 S.E.2d 850 (2017). *Wellman* limited its holding to proceeds leases and expressly excluded market value leases. Similarly, *Tawney* excluded market value leases from its certified question, and the circuit court subsequently predicted that West Virginia would adopt a different rule for market value leases that does not consider contract sales prices or proceeds. *See Tawney v. Columbia Nat. Res.*, No. 03-C-10E, 2007 WL 5539870, at *29 (W. Va. Cir. Ct. Roane Cty. June 27, 2007). *Young* and *Leggett*, among other cases, further counsel against extending *Wellman* and *Tawney* to market value leases. Accordingly, Plaintiffs cannot prove the third or fourth elements of their breach of contract claim because the Class Leases are market value leases not governed by *Wellman* and *Tawney*.

2

### 1. *Wellman* and *Tawney* are limited to proceeds leases.

By their own terms, *Wellman* and *Tawney* are limited to proceeds leases. Plaintiffs quote Syllabus Point 4 of *Wellman* without commenting on the fact that the holding in that Syllabus Point begins with the condition: "If an oil and gas lease provides for a royalty based on *proceeds* received by the lessee . . . ." *Id.* at Syl. Pt. 4 (emphasis added). *See* ECF No. 357 at 16. Nor do Plaintiffs address footnote 3 in *Wellman*, which states as follows: "Where leases call for the payment of royalties based on the *value* of oil or gas produced, and sold directly, the Court perceives that there are possibly different issues, and they are excluded from this discussion." *Wellman*, 557 S.E.2d at 264 n.3 (emphasis added). Thus, the West Virginia Supreme Court of Appeals recognized the distinctions between proceeds leases and market value leases, excluding market value leases from its holding on deductions as early as *Wellman*.

Contrary to Plaintiffs' argument, the holding in *Tawney*, which adopted the reasoning in *Wellman*, also was limited to proceeds leases. *See Tawney*, 633 S.E.2d at Syl. Pt. 1 ("'If an oil and gas lease provides for a royalty based on *proceeds* received by the lessee, unless the lease provides otherwise, the lessee must bear all costs incurred in exploring for, producing, marketing, and transporting the product to the point of sale.' Syl. Pt. 4, *Wellman v. Energy Res., Inc.*, 210 W. Va. 200, 557 S.E.2d 254 (2001)." (emphasis added)).

Plaintiffs acknowledge that the Court in *Tawney* reformulated the circuit court's certified questions. *Id.*, 633 S.E.2d at 25 n.2. *See* ECF No. 357 at 5. Plaintiffs, however, fail to acknowledge that the phrase "wholesale market at the well" was among the language that was dropped from the reformulated certified question that was answered in *Tawney*. *See id.* Nor do Plaintiffs acknowledge that the reformulated certified question in *Tawney* builds on *Wellman* and refers only to "price," which is synonymous with the term "proceeds" in Syllabus Point 4 of *Wellman* and

3

quoted in *Tawney*.² There simply is no indication that *Tawney* intended to expand *Wellman*'s holding beyond proceeds leases. Critically, the Court found the wellhead-type language in *Tawney* to be ambiguous not in the abstract but rather based on its context, i.e., there could be no price or proceeds at the wellhead because the gas at issue in *Tawney* was not sold at the wellhead. *Id.* at 272–73. Manifestly, the West Virginia Supreme Court of Appeals did not hold in *Tawney* that market value at the wellhead is ambiguous.

Plaintiffs also cannot and do not reconcile their argument with the fact that the circuit court in *Tawney* opined on market value leases in deciding post-trial motions. In pertinent part, the circuit court discussed the defendants' obligations under both market value and proceeds leases in terms of the price upon which royalties were to be based. *See Tawney v. Columbia Nat. Res.*, No. 03-C-10E, 2007 WL 5539870, at *6 n.3 (W. Va. Cir. Ct. Roane Cty. June 27, 2007). Ultimately, the circuit court predicted that the West Virginia Supreme Court of Appeals would adopt the majority view that royalties are paid on market value leases based on the market value without regard to contract sales prices or proceeds. *Id.* at *29.³

This distinction in *Wellman* and *Tawney* makes sense because the reasoning in those cases

---

² The certified question answered was this:

> In light of the fact that West Virginia recognizes that a lessee to an oil and gas lease must bear all costs incurred in marketing and transporting the product to the point of sale unless the oil and gas lease provides otherwise, is lease language that provides that the lessor's 1/8 royalty is to be calculated "at the well," "at the wellhead" or similar language, or that the royalty is an amount equal to 1/8 of the *price*, net all costs beyond the "wellhead," or "less all taxes, assessments, and adjustments" sufficient to indicate that the lessee may deduct post-production expenses from the lessor's 1/8 royalty, presuming that such expenses are reasonable and actually incurred.

*Tawney*, 633 S.E.2d at 274.

³ In so holding, the circuit court adopted the reasoning set forth in *Texas Oil and Gas Corp. v. Vela*, 429 S.W.2d 866 (Tex. 1968), which the circuit court described as a "seminal case" on the issue. *Tawney*, 2007 WL 5539870 at *29. As discussed in Antero's opening brief, *Imperial Colliery* adopted its own version of *Vela*, and expressly adopted the "work-back" method. ECF No. 356 at 12–13. *See Imperial Colliery*, 912 F.2d at 700–01. Plaintiffs attempt to dismiss the holding in *Imperial Colliery* by stating that decision was issued years before either *Wellman* or *Tawney* was decided. Neither *Wellman* nor *Tawney* discusses, let alone overrules, the pronouncement of West Virginia law contained in *Imperial Colliery*. If anything, the notable absence of *Imperial Colliery* from the discussions in *Wellman* and *Tawney* only further supports the fact that those cases were limited to proceeds rather than market value leases.

does not apply equally to market value leases. To the extent there is any ambiguity in proceeds leases, it arises out of the potential conflict between the phrase "at the wellhead" and the real-world place at which the sale actually occurs, which may not be "at the wellhead." The same is not true of market value leases, which do not turn on an actual sale having taken place. If the lease refers to value at the wellhead, there is no competing real-world location creating any ambiguity.[4]

### 2. Recent decisions recognize *Wellman* and *Tawney*'s limits and do not support an extension of their holdings.

In addressing several recent decisions and seeking to distinguish their holdings, Plaintiffs entirely miss the point. With respect to *Wellman* and *Tawney*, those recent cases are cited not for their precise holdings, but rather as clear instruction that the holdings in *Wellman* and *Tawney* should be read narrowly at best. Perhaps most compelling is the Fourth Circuit's recent decision in *Young*. In holding that the proceeds royalty provision at issue in that case unambiguously allowed deductions, *Young* put great weight on the West Virginia Supreme Court of Appeals' recent criticism of *Wellman* and *Tawney* in its *Leggett* decision. *Young* observed that *Leggett* expressly rejected *Tawney*'s assertion that the phrase "at the wellhead" is facially ambiguous. *Id.* at 207. It further noted that "*although Leggett didn't overrule Wellman and Tawney, its criticism of those cases and its endorsement of the work-back method inform our analysis here.*" *Young*, 982 F.3d at 207 (emphasis added). *Young* refused to give *Wellman* and *Tawney* more meaning than

---

[4] The Supreme Court of Texas recently discussed this distinction in *BlueStone Natural Resources II, LLC v. Randle*, No. 19-0459, 2021 WL 936175 (Tex. Mar. 12, 2021), wherein the court analyzed a printed lease form with a "market value at the mouth of the well" royalty provision and a lease addendum that required royalties to be calculated based on "gross value received" and "without deduction." *Id.* at *4. The Texas Supreme Court succinctly observed: "A provision requiring computation based on 'gross value received' inherently conflicts with a computation based on value received 'at the mouth of the well.' The former is a gross-proceeds equivalent from which postproduction costs may not be deducted, and the latter is a net-proceeds equivalent that contemplates deductions." *Id.* at *1. *See Lutz v. Chesapeake Appalachia, LLC*, No. 4:09-CV-2256, 2017 WL 4810703, at *7 (N.D. Ohio Oct. 25, 2017) (recognizing that "market value at the well" is unambiguous and specifies where gas is valued for royalty calculation).

5

the bare minimum required by their facts.[5]

Shortly after *Leggett*, the West Virginia Supreme Court of Appeals clearly recognized that the holding in *Wellman* was limited to proceeds leases in *Cabot Oil & Gas Corp. v. Beaver Coal Co., Ltd.*, No. 16-0904, 2017 WL 5192490 (W. Va. Nov. 9, 2017). Specifically, *Cabot* quoted with approval the arbitration panel's conclusion that "*Wellman* was 'expressly limited to "proceeds" leases, excluded "value" leases from the discussion and, even as to "proceeds" leases, failed to resolve the issue of the deductibility of "post-production" expenses, at least with respect to "mouth of the well" leases.'" *Id.* at *7 n.16. Plaintiffs' attempt to minimize the impact of *Cabot* based on the timing of the panel's decision fails because, in that same passage, *Cabot* concluded: "*Wellman* has never been reversed and continues to be the basis for the law in this state on the deduction of post-production costs." *Id.* (citing *Leggett*, 800 S.E.2d at 858 ("[I]t is *Wellman* which forms the foundation of the current state of West Virginia's law on deduction of post-production costs.")).

Plaintiffs do not dispute that this Court also recognized the limits of *Tawney* in *Richards v. EQT Production Co.*, No. 1:17cv50, 2018 WL 3321441 (N.D. W. Va. July 5, 2018). In *Richards*, the Court applied *Imperial Colliery* and expressly declined to apply *Tawney* to wellhead sales reasoning that the ambiguity inherent to the leases at issue in *Tawney* does not exist when gas is sold at the wellhead. *Id.* at *5 n.1.[6] This Court should recognize the limits of *Wellman* and *Tawney* in this action as well.

---

[5] Plaintiffs do not dispute that *Leggett* went to great lengths to signal the demise of *Wellman* and *Tawney* and their iteration of the marketable product rule, citing with approval authorities criticizing any extension of the first marketable product doctrine in *Wellman* and *Tawney* to the manufacturing of residue gas and NGLs through processing and fractionation of wet gas. *Leggett*, 800 S.E.2d at 862–63.

[6] Plaintiffs' attempt to discredit Antero's wellhead sales is unavailing to the extent Plaintiffs apparently apply the term "at the well" literally to mean at the mouth of the well. Courts, however, have viewed the term "at the well" as any point on a particular leased premises. *See Exxon Corp. v. Middleton*, 613 S.W.2d 240, 243 (Tex. 1981) (recognizing the term "sold at the wells" referred to gas sold within the lease).

### 3.     The Class Leases are plain and unambiguous and allow for deductions.

The market value royalty provisions in the Class Leases are unambiguous and authorize Antero to calculate royalties for gas using the "work-back" method adopted in *Imperial Colliery* for market value leases and endorsed in *Young* and *Leggett*. Plaintiffs avoid discussion of the Romeo Gas Royalty Language and the Rine and Miller Gas Royalty Language. As addressed in Antero's opening brief without refutation, all Class Leases have market value at the wellhead gas royalty provisions that unambiguously authorize Antero to use the "work-back" method. *See* ECF No. 356 at 13–14.

As to NGLs, Antero is either authorized to take deductions or has no obligation to pay royalties at all. The Rine and Miller Gas Royalty Language does not provide for royalties on NGLs. In Romeo's 1984 Mutschelknaus Lease, the by-products provision provides for royalties on the "net value at the factory," *i.e.*, less costs: "*Lessors' proportionate share of the one-eighth (1/8th) of the net value at the factory of the gasoline and other gasoline products manufactured from casinghead gas.*" *See* ECF No. 31 at 16.

Plaintiffs argue that the by-products provision in Romeo's 1984 Mutschelknaus Lease does not apply to NGLs. If so, then no provision provides for royalties on NGLs, and Antero satisfied its obligations to pay gas royalties based on the market value at the wellhead.[7] In any event, Plaintiffs are wrong that the provision relates to oil royalties, as it is contained within the gas royalty provision and is separate and apart from the oil royalty provision.[8]

---

[7] Notwithstanding this fact, Antero exceeded its obligations by paying Plaintiffs royalties for NGLs in months where Plaintiffs would benefit from Antero's NGL upgrade.

[8] The restrictive definition on which Plaintiffs rely for "casinghead gas" as being limited to gas produced from oil wells overlooks the fact that other courts and the Department of the Interior consistently have interpreted "natural gas liquids" as being synonymous with "casinghead gasoline." *See Anderson Living Tr. v. XTO Energy, Inc.*, No. 13-CV-941-SWS-KK, 2019 WL 4015210, at *14, 18 (D.N.M. May 15, 2019) (finding that "casinghead gasoline" refers to all NGLs); *ConocoPhillips Co. v. Lyons*, MMS-09-0039-O&G (FE), 2012 WL 6568516, at *3 (Sept. 27, 2012) (stating that the DOI "has consistently interpreted the term 'casing-head gasoline' to be synonymous with NGLs" when addressing whether the term "casinghead gas" includes all NGLs or only pertains to heavier hydrocarbons).

Further, Plaintiffs cannot distinguish *Richards*, in which this Court held that payment of royalties on NGLs was governed by a similar provision. *Richards*, 2018 WL 3321441, at *5–6. Although the by-products provision in *Richards* contained the parenthetical phrase "being gas produced from oil wells" following the term "casing head gas," the Court did not rely on that phrase in its holding. *Id.* at *1. Significantly, Plaintiffs' speculation that the defendant in *Richards* produced oil is proven false because in that case it was "undisputed that the[] wells produce natural gas from the leasehold estates." *Id.* Nonetheless, the Court held that this by-products provision unambiguously applied to NGLs. *Id.* at *5–6. Because Romeo's 1984 Mutschelknaus Lease does not purport to restrict casinghead gas to oil wells, application of the by-products provision is even clearer than in *Richards*.

### 4. **Antero is not obligated to bear costs to the point of sale.**

Even if *Wellman* and *Tawney* apply to the Class Leases, which they do not, Antero still would not be obligated to bear costs incurred until the point of sale, as recognized in *Cather v. EQT Production Co.*, No. 1:17cv208, 2019 WL 3806629 (N.D. W. Va. Aug. 13, 2019), and *W.W. McDonald Land Co. v. EQT Production Co.*, 983 F. Supp. 2d 790 (S.D. W. Va. 2013). Plaintiffs do not dispute the holding in *W.W. McDonald Land Co.*, and their tortured reading of *Cather* is disingenuous.[9] Critically, Plaintiffs do not dispute that in *Cather*, the Court adopted a synthesized reading of *Wellman* and *Tawney* that concluded that "lessees have a duty to bear all costs incurred until the gas reaches *market, not to a point of sale*." *Id.* at *3 (emphasis added) (citing *W.W. McDonald Land Co.*, 983 F. Supp. 2d at 800). *But cf. Richards*, 2018 WL 3321441, at *5 n.1 (applying *Imperial Colliery* and declining to apply *Tawney* to wellhead sales because "[t]he

---

[9] Plaintiffs' reliance on interlocutory orders denying motions to dismiss in *Corder v. Antero Resources Corp.*, 322 F. Supp. 3d 710 (N.D. W. Va. 2018), and *Goodno v. Antero Resources Corp.*, No. 5:20cv100 (N.D. W. Va. July 21, 2020) (ECF No. 23), is likewise misplaced.  Cross-motions for summary judgment are pending in *Corder*, and Plaintiffs in *Goodno* have amended their complaint following *Young*. *See Goodno* at ECF No. 40.

holding in *Tawney* presumes a sale of gas downstream from the wellhead").

Factually, the evidence is undisputed that Antero has taken no deductions until its gas reaches a market. Plaintiffs do not dispute Antero's evidence that Antero does not take TRN3 deductions before gas reaches the TCO line or that PRC2 includes certain processing plant and fractionation charges associated with the manufacture of NGLs, which occurs after the gas reaches a market. *See* Schopp Dep. Tr. 88:4–17, 108:9–16, 145:22–146:5, 151:3–152:22.[10] Nor do Plaintiffs dispute that these types of charges were not at issue in *Tawney*. Thus, even if *Wellman* and *Tawney* apply, Antero is entitled to summary judgment on Plaintiffs' claims for breach of contract.[11]

> **B. To the Extent the Modified Class Leases Remain Part of This Case, Antero Has Not Breached the Modified Class Leases.**

Assuming modifications to the Class Leases are properly before this Court, Antero has not breached any such lease modifications. In the Class Certification Order, this Court recognized that, if lease modifications would need to be evaluated at all, they would need to be evaluated in subclasses.[12] Specifically, persons and entities who have been paid royalties pursuant to lease modifications that alter the royalty provisions of the Class Leases have not been paid pursuant to either of the gas royalty provisions quoted in the class definition. *See* ECF No. 152 at 42.

> **1. Net amount realized and net proceeds modifications.**

Plaintiffs do not dispute that modifications with a net amount realized royalty provision (ECF No. 356-4) or a net proceeds royalty provision (ECF No. 356-5) are governed by *Young*.

---

[10] A complete copy of the transcript of the April 24, 2019 deposition of Alvyn Schopp is at ECF No. 130-1.

[11] Plaintiffs' reliance on the Court's Memorandum Opinion and Order Denying Defendant's Motion to Dismiss Second Amended Complaint in this action is misplaced. This ruling was entered on September 5, 2018, which was before *Cather* recognized that lessees have a duty to bear all costs incurred until the gas reaches *market, not to a point of sale,* and before the Fourth Circuit's decision in *Young*. *See* ECF No. 38. In any event, the law of the case doctrine does not apply to an interlocutory order denying a motion to dismiss. *Bison Res. Corp. v. Antero Res. Corp.*, No. 1:16cv107, 2018 WL 4558474, at *3 (N.D. W. Va. Sept. 21, 2018).

[12] Plaintiffs do not dispute that they are unable to represent any such subclasses.

Rather, Plaintiffs argue with no support that these modifications do not alter Class Leases but are instead "original" oil and gas leases, relying solely on the title of these instruments to assert that they cannot be modifications of an existing lease.[13] Plaintiffs' argument is specious. *Thornsbury v. Cabot Oil & Gas Corp.*, 231 W. Va. 676, 749 S.E.2d 569 (2013), recognized that "[i]t is a well-established, fundamental principle of contract law that a valid, unambiguous written contract may be modified or superseded by a subsequent contract based on a valuable consideration." *Id.*, 749 S.E.2d at 573 (citation omitted). Likewise, in *Consolidation Coal Co. v. Mineral Coal Co.*, 147 W. Va. 130, 126 S.E.2d 194 (1962), the West Virginia Supreme Court of Appeals recognized:

> A mineral lease may be modified by agreement of the parties provided the modification is supported by a sufficient consideration; and the modification may consist of the new terms and as much of the old lease as the parties have agreed shall remain unchanged, in which case the terms and conditions of the original lease, so far as consistent with the modified contract, will remain in full force and effect and become incorporated in the modified contract.

*Id.*, 126 S.E.2d at 201 (citations omitted). *See also* Syl. Pt. 3, *Myers v. Carnahan*, 61 W. Va. 414, 57 S.E. 134 (1907) ("Where a new contract is made with reference to the subject-matter of a former contract, containing provisions clearly inconsistent with certain provisions of the original contract, the obligations of the earlier contract, in so far as they are inconsistent with the later one, will be abrogated and discharged, and the two contracts will be construed together, disregarding the provisions of the original which are inconsistent with those of the latter.").

Here, the disputed instruments modify and alter the royalty provisions of valid and subsisting Class Leases. *See* Schopp Aff. (discussing modifications to the Class Leases and

---

[13] In this action, there are twenty-five instruments that modify twelve Class Leases and impact twenty-five Certified Class members. In their response, Plaintiffs contend that twelve of these instruments do not modify the six Class Leases associated therewith because they are "original" oil and gas leases, apparently based on the titles of these documents as "Oil and Gas Lease" rather than "Modification of Oil and Gas Lease." *See* ECF No. 357 at 18–21. As discussed herein, Plaintiffs are simply wrong because Antero is paying based on the royalty provisions contained in these modifications, regardless of the title of the documents. In any event, by disputing which lease provisions control this subset of Class Leases, Plaintiffs have manufactured additional issues of material fact regarding the first element of their breach of contract claim which preclude summary judgment to Plaintiffs.

10

Antero's interpretation and royalty payments thereto).[14] To the extent the modifications contain royalty provisions inconsistent with the quoted royalty provisions contained in the Class Leases, the royalty provisions in the modifications control; however, this does not change the fact that the Class Leases remain valid and subsisting leases for the properties covered thereby in other respects.

To this end, lease modifications with the net amount realized royalty provision are nearly identical to the royalty provision that *Young* held unambiguously allowed use of the work-back method to calculate royalties by subtracting those costs from the sales proceeds. *See* ECF No. 356-4; *see also* Schopp Aff. Similar to *Young*, the net amount realized is adjusted for the lessor's fractional share of the total pooled acreage and their royalty rates as reflected in the lease modifications. *See* ECF No. 356-4 at 3.[15] Accordingly, the net amount realized royalty provision unambiguously allows Antero to deduct costs from royalties using the work-back method adopted in *Leggett* and applied in *Young*.

Likewise, lease modifications with the net proceeds royalty provision also are substantially similarly to the net amount realized royalty provision that *Young* held unambiguously allowed use of the work-back method. *See* ECF No. 356-5; *see also* Schopp Aff. Alternatively, the net proceeds royalty provision states that if such charges are incurred by the lessee rather than the purchaser charges will be made by lessee and computed based on an index. *See* 8 Williams & Meyers, *Manual of Oil and Gas Terms* (2020) (noting that the term "net proceeds" implies that the parties intended to "make deductions to account for costs"). Moreover, similar to *Young*, the net amount realized is adjusted for the lessors' fractional share of the total pooled acreage and their royalty rates as reflected in the lease modifications. *See* ECF No. 356-5 at 1. Accordingly, the net proceeds

---

[14] The Affidavit of Alvyn A. Schopp is attached hereto as "Exhibit A."
[15] Indeed, in *Goodno v. Antero Resources Corporation*, No. 5:20cv100 (N.D. W. Va. Jan. 8, 2021), this Court entered a stipulation amending a class action complaint to remove and strike an Antero lease form with an identical royalty provision, citing *Young*. *See id.* at ECF No. 40.

royalty provision unambiguously allows Antero to subtract costs from proceeds received to determine net proceeds using the work-back method adopted in *Leggett* and applied in *Young*.

### 2. Market enhancement modifications.

Similarly, Plaintiffs argue with no support that at least some of the lease modifications with market enhancement royalty provisions are separate leases that do not modify class leases. Again, this argument is specious because these are valid modifications to Class Leases under *Thornsbury*. *See* ECF No. 356-6, 356-7, 356-8; *see also* Schopp Aff.

This Court already has recognized that a lease with a market enhancement royalty provision may comply with *Tawney*. *See Corder v. Antero Res. Corp.*, 322 F. Supp. 3d 710 (N.D. W. Va. 2018). The Court's recognition in *Corder* is consistent with the Fourth Circuit's holding in *Young*. Although few courts have had the occasion to consider market enhancement royalty provisions specifically, those that have examined such provisions have found such language permits deductions. For example, in *Bond v. Antero Resources Corporation*, No. 2:17-CV-14, 2018 WL 3159155, at *2–3 (S.D. Ohio June 28, 2018), the court granted a partial motion to dismiss as it applied to a claim for breach of similar market enhancement provisions. The court reasoned that although Antero could not "deduct costs arising from actions taken 'to transform the product into marketable form,'" *id.* at *3, the plain language of the market enhancement provision allowed Antero "to deduct post-production costs from Plaintiffs' royalties if those costs enhance the value of the marketable gas." *Id.* The court expressly found that Antero could deduct "'any such costs which result in enhancing the value' of the gas 'to receive a better price.'" *Id.*

One of the market enhancement clauses in *Bond* also included the same language that concludes: "[I]n no event shall Lessor receive a price per unit that is less than the price per unit received by Lessee." 2018 WL 3159155, *2. *Cf.* ECF No. 93-6 at 3 ("In no event shall Lessor receive a price that is less than or more than the price received by Lessee"). Inclusion of this

12

language in the royalty provision did not preclude the court from dismissing the plaintiffs' claim in *Bond*, and it should not do so here because such language merely caps what the royalty owner receives. *See Bounty Mins., LLC v. EQT Prod. Co.*, No. 1:17cv220, 2018 WL 2749598, at *4 (N.D. W. Va. June 7, 2018) (rejecting the plaintiffs' argument regarding construction of lease language where the same language was present in other cases but did not affect the decisions).

As in *Bond*, Antero's market enhancement royalty provision unambiguously distinguishes between costs associated with transforming the product into marketable form, which are not deductible, and costs incurred after the product is in marketable form which are deductible. As Ms. Terry opined: "[I]t it is worth noting that Antero incurs all lease operating expenses for the gas produced from the leases at issue." Terry Report at 11–12 (ECF No. 356-3). In other words, the evidence is undisputed that Antero does not charge production costs, or those costs associated with transforming the product into marketable form.

Similar to *Young*, the market enhancement provision unambiguously provides that Antero may charge certain post-production costs and identifies the post-production costs with particularity. The canon of *expressio unius est exclusio alterius* applies to the language in the truncated market enhancement provision that royalties "shall be without deduction, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder to transform the product into marketable form." Because the truncated market enhancement provision states that Antero may not take specified deductions to transform the product into a marketable form, Antero may take those specified deductions once the product is in marketable form. It is undisputed that Antero's gas is in a marketable form at the wellhead. *See* Terry Report at 7, 9, 12 (ECF No. 356-3) (stating gas is in a marketable form at the wellhead).

13

In addition, the market enhancement provisions indicate the method for calculating the amount of post-production costs to be deducted. That method is simply to add the identified, reasonable, and actually incurred post-production costs once the product is in marketable form and deduct them from Antero's gross proceeds to get the amount realized. The amount realized is then adjusted for the lessors' fractional share of the total pooled acreage and their royalty rates as reflected in the leases. *See, e.g.*, ECF No. 356-6 at 2 ("The royalties . . . shall be tendered or paid to Lessor in the proportion that Lessor's acreage in the pooled area(s) bears to the total pooled area."). Moreover, Antero pays royalties at the percentage royalty rate stated in the base lease, unless modified. Accordingly, the market enhancement provisions unambiguously allow Antero to use the work-back method. Thus, Antero has not breached these lease modifications as a matter of law. Therefore, to the extent such modifications properly are before the Court, Antero is entitled to summary judgment on Plaintiffs' claims for breach of the lease modifications.

### C. There has been no injury because Antero exceeded its obligations.

Finally, Plaintiffs and the Certified Class have no injury because Antero has exceeded its royalty obligations. Notwithstanding the fact that Antero is permitted to take deductions under the Class Leases and modifications thereto, the undisputed evidence is that Antero has *overpaid* Plaintiffs. First, it is undisputed that Antero pays royalties on unsold volumes of gas because it pays royalties on the volume of gas determined at the wellhead as opposed to the sales volume. Plaintiffs' expert, Donald Phend, concedes that Antero would be entitled to an offset for royalties based on unsold volumes of gas. *See* ECF No. 354-30. Second, although overlooked by Mr. Phend, the price Antero achieves for its gas sales (i.e., its "WASP") historically has been much higher than the local index price. *See* Terry Report at 17 & Ex. D (ECF No. 356-3). Antero passes on the benefits of its WASP to Plaintiffs, even though the market value Class Leases allow Antero to base royalties on local index prices. Third, Antero pays royalty owners for the value of NGLs if such

payment results in a greater payment to the royalty owner after considering the costs to manufacture NGLs, which ensures that, at a minimum, royalty owners receive the market value of their gas at the wellhead. Finally, although entitled to deduct costs such as gathering, compression, local transportation, fuel, and line loss, Antero typically does not reduce the royalty by these amounts, thereby resulting in higher payments to royalty owners. Plaintiffs simply have no injury because Antero has exceeded its obligations under the leases. For these additional reasons, Antero is entitled to summary judgment on Plaintiffs' claims for breach of contract.

### III.   CONCLUSION

For all of the foregoing reasons, the Court should grant this motion and enter summary judgment for Defendant Antero Resources Corporation.

*/s/ W. Henry Lawrence*
W. Henry Lawrence (WV Bar #2156)
hank.lawrence@steptoe-johnson.com
Amy M. Smith (WV Bar #6454)
amy.smith@steptoe-johnson.com
Lauren K. Turner (WV Bar #11942)
lauren.turner@steptoe-johnson.com
Shaina D. Massie (WV Bar #13018)
shaina.massie@steptoe-johnson.com
Steptoe & Johnson PLLC
400 White Oaks Boulevard
Bridgeport, WV  26330
(304) 933-8000

Nicolle R. Snyder Bagnell (WV Bar #11081)
nbagnell@reedsmith.com
Reed Smith LLP
225 Fifth Avenue
Pittsburgh, PA 15222
(412) 288-7112

*Counsel for Defendant*
*Antero Resources Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 19th day of March 2021, I electronically filed the foregoing "Antero Resources Corporation's Reply in Support of Motion for Summary Judgment" with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to the following CM/ECF participants:

>George A. Barton, Esquire
>gab@georgebartonlaw.com
>Stacy A. Burrows, Esquire
>stacy@georgebartonlaw.com
>Taylor P. Foye, Esquire
>taylor@georgebartonlaw.com
>Law Offices of George A. Barton, P.C.
>7227 Metcalf Avenue, Suite 301
>Overland Park, KS 66204
>
>Howard M. Persinger, III, Esquire
>hmp3@persingerlaw.com
>Persinger & Persinger, L.C.
>237 Capitol Street
>Charleston, WV 25301
>
>Larry Lee Javins, II, Esquire
>ljavins@bjc4u.com
>Taylor M. Norman, Esquire
>tnorman@bjc4u.com
>Bailey, Javins & Carter, LC
>213 Hale Street
>Charleston, WV 25301
>
>Nicolle R. Snyder Bagnell, Esquire
>nbagnell@reedsmith.com
>Reed Smith LLP
>225 Fifth Avenue
>Pittsburgh, PA  15222

>*/s/  W. Henry Lawrence*
>W. Henry Lawrence (WV Bar #2156)

16