IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

JACKLIN ROMEO,
Individually and on behalf
of others similarly situated;
SUSAN S. RINE,
Individually and on behalf
of others similarly situated;
DEBRA SNYDER MILLER,
Individually and on behalf
of others similarly situated,

        Plaintiffs,

v.                                      CIVIL NO. 1:17CV88
                                             (KLEEH)

ANTERO RESOURCES CORP.,

        Defendant.

**MEMORANDUM OPINION AND ORDER GRANTING MOTION TO CERTIFY**

In this breach of contract class action, the plaintiffs, Jacklin Romeo ("Romeo"), Susan S. Rine ("Rine"), and Debra Snyder Miller ("Miller") (collectively, "the Plaintiffs"), individually and on behalf of others similarly situated, allege that the defendant, Antero Resources Corporation ("Antero"), breached its obligations under the royalty provisions of two types of lease agreements by improperly deducting post-production costs and failing to pay royalties based upon the price received at the point of sale. ECF No. 31, Second Am. Compl.

Antero filed its Motion to Certify Questions to the Supreme Court of Appeals of West Virginia on September 12, 2023. ECF No. 412. It asks this Court to certify two questions:

1) Does Wellman and Tawney's applicability extend only to the "first available market" as opposed to the "point of sale" when the duty to market is implicated?

2) Does the first marketable product rule extend beyond gas to require a lessee to pay royalties on NGLs, and if it does, do the lessors share in the cost of processing, manufacturing, and transporting the NGLs to sale?

ECF No. 412 at 1.

## I.   FACTS

### A. The Class Leases

Each of the Plaintiffs alleges ownership of an oil and gas interest in Harrison County, West Virginia, subject to an existing oil and gas lease under which the lessee's interest has been assigned to Antero. ECF No. 31, Second Am. Compl.

Romeo is the assignee of a portion of the lessors' interest under a March 14, 1984 lease agreement between lessors Jessie J. Nixon, Betty Nixon, Mary Alice Vincent, and Hubert L. Vincent, and lessee Clarence W. Mutschelknaus ("the Mutschelknaus Lease"). Id. ¶ 20.  Antero acquired the lessee's rights and obligations under this lease agreement. Id. ¶ 19.  The royalty provision of the Mutschelknaus Lease contains the following language:

> In consideration of the premises, the said [Lessee] covenants and agrees: First, to deliver monthly to the credit of the Lessors, their heirs or assigns, free of costs, in a pipeline, to which Lessee may connect its wells, Lessors' proportionate share of the equal one-eighth (1/8) part of all oil

> produced and saved from the leased premises; and second, to pay monthly Lessor's proportionate share of the one-eighth (1/8) of the value at the well of the gas from each and every gas well drilled on said premises, the product from which is marketed and used off the premises, said gas to be measured at a meter set on the farm, and to pay monthly Lessors' proportionate share of the one-eighth (1/8) of the net value at the factory of the gasoline and other gasoline products manufactured from casinghead gas.

Id.

Rine and Miller are assignees of portions of the lessors' interest under an October 19, 1979 lease between lessors Lee H. Snyder, and Olive W. Snyder, and lessee Robert L. Matthey, Jr. ("the Matthey Lease"). Id. ¶¶ 22-23. Antero was assigned the lessee's interest. The royalty provision of the Matthey Lease contains the following language:

> (a) Lessee covenants and agrees to deliver to the credit of the Lessor, his heirs or assigns, free of cost, in the pipe line to which said Lessee may connect its wells, a royalty of one-eighth (1/8) of native oil produced and saved from the leased premises.
>
> (b) Lessee covenants and agrees to pay Lessor as royalty for the native gas from each and every well drilled on said premises producing native gas, an amount equal to one-eighth (1/8) of the gross proceeds received from the sale of the same at the prevailing price for gas sold at the well, for all native gas saved and marketed from the said premises, payable quarterly.

Id. ¶ 24.

**MEMORANDUM OPINION AND ORDER GRANTING MOTION TO CERTIFY**

On October 2, 2017, the Plaintiffs filed a second amended class action complaint asserting a breach of contract claim related to Antero's alleged failure to pay them a full 1/8th royalty payment for their natural gas interests. Id. ¶ 25. Gas produced under the leases at issue (the "Class Leases") consists of "wet gas" (saturated with liquid hydrocarbons and water) that may be processed to obtain marketable "residue gas." Id. ¶¶ 26-27. This wet gas also "contains valuable liquid hydrocarbon components" (ethane, butane, isobutane, propane, and natural gas) ("NGLs") that may be extracted and fractionated prior to sale. Id. ¶ 28.

The Plaintiffs contend that, because neither of the Class Lease royalty provisions expressly permit post-production deductions, West Virginia law imposes a duty upon Antero to calculate royalties based on the price it receives from third parties for the residue gas and NGLs without deductions. Id. ¶ 30. They assert that despite this duty Antero has deducted various post-production costs for residue gas and NGLs from their royalties. Id.

Antero has produced natural gas from wells subject to the Class Leases. Id. ¶ 34. The raw gas extracted from the Plaintiffs' wells enters a gathering system and commingles with gas from other wells. Id. Typically, Antero then transports this raw gas to a processing plant where a "Y Grade mix of NGLS" is extracted from

the "residue gas." Id. Antero transports the residue gas to transmission pipelines where it is sold to third party purchasers. Id. Antero also transports the Y Grade mix of NGLs from the processing plant to a fractionation facility where the mix is separated into identifiable NGL products. Id. Antero, or its agent, then sells these NGL products to third party purchasers at or near the outlet of the fractionation facility. Id.

**B. Antero's calculation of royalty payments**

According to Antero, it "pays royalties for gas using the weighted average sale price ("WASP"), which is the weighted average of the price received by Antero for all of its gas sales" and it "generally does not deduct charges for fuel, treating, compression, gathering, line loss, or local transportation from lessors' royalties" ECF No. 356 at 2. However, "if the manufacture of NGLs results in a higher price than the value of the gas used to manufacture the NGLs, Antero typically pays on the Wellhead Gas Value minus shrink and the higher net NGL value. Id. Likewise, if by transporting gas out of Appalachia to more lucrative markets, Antero obtains a price that is higher than the local index price, Antero charges the additional transportation costs up to the limit of the greater value received." Id. at 2-3. Antero asserts that this calculation enhances the Plaintiffs' royalties. Id. at 4.

The Plaintiffs, however, contend that Antero has not paid them their full 1/8th royalty payment for their natural gas interests because it calculates their residue gas and NGLs royalties based on a dollar amount less than the actual sale price ECF No. 354-1 at 6.  As a result, Plaintiffs assert that, between January 2009 and July 2021, Antero underpaid them $6,314,814.50 in residue gas and NGL royalties Id. at 11.  Specifically, according to the Plaintiffs, Antero improperly deducts post-production costs such as gathering, compressing, and processing ("PRC2 deductions") as well as the cost of transporting the residue gas to the point of sale ("TRN3 deductions") Id. at 6–7.

The Plaintiffs also assert that Antero deducts various post-production costs from their NGL royalties. When Antero calculates the Plaintiffs' NGL royalties under its "processing cost deduction method," Antero deducts "various costs related to processing and fractionating" from the sale price prior to calculating their royalties. Id. at 7.  Then Antero calculates their NGL royalties under its "shrink value method," Antero multiplies the volume of the natural gas used to produce the NGLs by the WASP for the residue gas. Id.  In this calculation, Antero disregards the sale proceeds actually received which and the royalties the Plaintiffs' receive are "consistently less than the royalties which the [Plaintiffs] would receive if they were paid royalties based upon

prices received by Antero on its sale of [NGLs] at the point of sale." Id.  Further, the Plaintiffs contend that when MarkWest acts as Antero's agent sell NGL products, it remits a net sales price to Antero — the sale price of Antero's NGLs, minus fees and charges which it is permitted to deduct pursuant to its "NGL Exchange Agreement" with Antero. Id. at 8.  In this instance, the Plaintiffs assert that Antero improperly calculates their royalties based on the net price remitted by MarkWest instead of the sale price actually received by MarkWest as Antero's agent.

## II.  RELEVANT PROCEDURAL HISTORY

On March 23, 2020, pursuant to Federal Rule of Civil Procedure 23(b)(3), the Court entered a Class Certification Order, which defined the following Class:

> Persons and entities, including their respective successors and assigns, to whom Antero has paid royalties ("Royalties") on Natural Gas, including natural gas liquids, produced by Antero from wells located in West Virginia at any time since January 1, 2009, pursuant to Leases which contain either of the following gas royalty provisions: (a) [Lessee] covenants and agrees "to pay monthly Lessors' proportionate share of the one-eighth (1/8) of the value at the well of the gas from each and every gas well drilled on said premises, the product from which is marketed and used off the premises, said gas to be measured at a meter set on the farm"; or (b) "Lessee covenants and agrees to pay Lessor as royalty for the native gas from each and every well drilled on said premised producing native gas,

> as amount equal to one-eighth (1/8) of the gross proceeds received from the sale of the same at the prevailing price for gas sold at the well, for all native gas saved and marketed from the said premises, payable quarterly."
>
> The Class excludes: (1) agencies, departments, or instrumentalities of the United State of America; (2) publicly traded oil and gas exploration companies; (3) any person who is or has been a working interest owner in a well produced by Antero in West Virginia; and (4) Antero.

ECF No. 152 at 42-43. The Court also identified four common questions of law and fact:

> 1) Do Wellman and Tawney apply to both market value and proceed leases?
>
> 2) If so, do the leases at issue, as modified by any subsequent modifications (if any), have the specific language required by Wellman and Tawney that would allow Antero to deduct post-production expenses from the Plaintiffs' royalty payments?
>
> 3) If not, did Antero unlawfully deduct postproduction expenses from the Plaintiffs' royalty payments?
>
> 4) If so, how did Antero calculate these deductions?

Id. at 32.

Antero produced unredacted copies of 283 leases it determined met the Class Definition on May 15, 2020 and an additional 165 leases on June 26, 2020. See ECF No. 212 at 15; ECF No. 233-1 at

<u>**MEMORANDUM OPINION AND ORDER GRANTING MOTION TO CERTIFY**</u>

1-2. Following approval of the Class Notice and the Class administrator, the Class administrator mailed that notice to 1,047 Class Members on July 30, 2020. ECF No. 233-1.

Following several discovery disputes on the issue, on December 18, 2020, the Plaintiffs sought an order declaring that an additional 111 leases identified as the "Removed" leases, the "No Payee" leases, and the "No Payment" leases were part of the Class. ECF No. 342 at 1. After the Court found that only the Removed Leases met the Class definition, the Class Administrator mailed the Class Notice to two (2) payees receiving royalties from Antero under the Removed Leases on June 25, 2021. ECF No. 367.

Following the conclusion of discovery, the parties filed cross motions for summary judgment on the Plaintiffs' breach of contract claim and the Plaintiffs moved for summary judgment on each of Antero's affirmative defenses [ECF Nos. 353, 354, 355]. While those cross motions were pending, Antero moved to stay the case pending the Fourth Circuit's final decision in <u>Corder v. Antero Res. Corp.</u>, 57 F.4th 384, 396 (4th Cir. 2023). ECF No. 368. The Court granted the motion and stayed the case pending resolution of the appeal in Corder. ECF No. 376.

Thereafter this matter was reassigned to Chief Judge Kleeh. ECF No. 384. On January 9, 2023, Plaintiffs filed a motion to lift stay and attached the Fourth Circuit's decision in <u>Corder</u>.

ECF No. 385. After a hearing, the Court granted the motion to lift stay, lifted the stay, and directed supplemental briefing as to the parties' motions for summary judgment and Corder's impact. ECF No. 393. The parties timely filed supplemental briefs. ECF Nos. 400, 401. On September 12, 2023, the motion to certify questions to the Supreme Court of Appeals of West Virginia was filed. ECF No. 412. The motion is fully briefed and ripe for review.

### III. LAW

West Virginia has enacted the Uniform Certification of Questions of Law Act, ("UCQLA"), W. Va. Code § 51-1A-1, et seq., which provides:

> The Supreme Court of Appeals of West Virginia may answer a question of law certified to it by any court of the United States ... if the answer may be determinative of an issue in a pending case in the certifying court and if there is no controlling appellate decision, constitutional provision or statute of this state.

W. Va. Code § 51-1A-3. The Supreme Court of Appeals has recognized that the purpose of this statute is "to provide foreign courts with the benefit of [its] determination of West Virginia law" and "to resolve ambiguities or unanswered questions" in the same. Abrams v. W. Va. Racing Comm'n, 263 S.E.2d 103, 106 (W. Va. 1980) (internal quotations omitted); see also Morningstar v. Black and

Decker Mtg. Co., 253 S.E.2d 666, 669 (W. Va. 1979). The provisions of the UCQLA are discretionary for both the certifying court and the Supreme Court of Appeals. Abrams, 263 S.E.2d at 105; see also Lehman Bros. v. Schein, 416 U.S. 386, 391 (1974) ("[Certification's] use in a given case rests in the sound discretion of the federal court.").

## IV. DISCUSSION

Certification of the questions proposed by Antero is appropriate because their resolution will determine the viability of the sole cause of action alleged in Plaintiffs' Second Amended Class Complaint, in which Plaintiffs allege Antero took improper deductions from their royalties under the Class Leases, and there is no controlling precedent under West Virginia law.

### A. Issue Determinative

The first prong of the UCQLA requires that a certified question be issue determinative. W. Va. Code § 51-1A-3. The certified question must "be pertinent and inevitable in the disposition of the case below." Hairston v. Gen. Pipeline Constr., Inc., 704 S.E.2d 663, 673 n.5 (W. Va. 2010). The Supreme Court of Appeals "will not consider certified questions not necessary to the decision of a case." Zelenka v. City of Weirton, 539 S.E.2d 750, 752 (W. Va. 2000) (citing Shell v. Metropolitan Life Ins. Co., 380 S.E.2d 183 (W. Va. 1989). To that end, "certification

requires 'a sufficiently precise and undisputed factual record on which the legal issues can be determined . . . [and that] such legal issues . . . substantially control the case.'" Zelenka, 539 S.E.2d at 752 (alteration in original) (quoting Bass v. Coltelli, 453 S.E.2d 350, 356 (W. Va. 1994)).

Because answers to the questions to be certified will determine whether Antero was permitted to deduct post-production costs from the Plaintiffs' royalties, it will determine the viability of Count One. Hairston, 704 S.E.2d at 673 n.5. The factual record is sufficiently developed for certification. The Plaintiffs acknowledge that the Class Leases entitle lessors to receive royalties. Antero does not dispute that it has marketed the Plaintiffs' share of gas and has taken certain post-production deductions from the Plaintiffs' royalties. Thus, no material facts are in dispute. The questions to be certified are purely legal questions involving West Virginia oil and gas law.

**B. No Controlling Appellate Authority**

The second prong of the UCQLA is satisfied if it "appears to the certifying court there is no controlling precedent in the decisions of the [S]upreme [C]ourt of [West Virginia]." Morningstar, 253 S.E.2d 666, 669 (W. Va. 1979). Here, there is no controlling authority addressing whether West Virginia's

"marketable product rule" extends only to the "first available market" as opposed to the "point of sale."

More than twenty years ago, the WVSCA issued its decision in Wellman v. Energy Resources, establishing West Virginia as a marketable product rule state. 577 S.E.2d 254, 265 (W. Va. 2001). As such, under West Virginia law, an oil and gas lessee has an implied duty to market the product produced and "bears all post-production costs incurred until the product is first rendered marketable, unless otherwise indicated in the subject lease." SWN Prod. Co., LLC v. Kellam, 875 S.E.2d 216, 221 (2022) (citing Wellman, 557 S.E.2d at 256, syl. pts. 4 and 5). For a lessee to deduct any post-production costs from a lessor's royalty payments, the lease must expressly allocate such costs to the lessor and the lessee must prove that the costs were actually incurred and reasonable. Wellman, 577 S.E.2d at 265.

Thereafter, the WVSCA reiterated the "default rule is that lessees bear the brunt of post-production costs absent lease language shifting that cost—or a portion thereof—to the lessor" in Tawney. Kellam, 875 2d at 223 (citing Syl. Pt. 10, Estate of Tawney v. Columbia Nat. Res., 633 S.E.2d 22, 24 (W. Va. 2006)). Tawney also set forth three basic requirements to rebut the presumption that the lessee bears all post-production costs: the lease must (1) "expressly provide that the lessor shall bear some

part of the costs incurred between the wellhead and the point of sale;" (2) "identify with particularity the specific deductions that the lessee intends to take from the lessor's royalty;" and (3) "indicate the method of calculating the amount to be deducted from the royalty for such post-production costs." Tawney, 633 S.E.2d at 30. The WVSCA recently reaffirmed these principles in SWN Prod. Co., LLC v. Kellam, 875 S.E.2d 216 (W. Va. 2022). There, it held that Tawney remained good law and that whether a particular lease satisfies the Wellman and Tawney requirements "is a question of contract interpretation guided by principles of contract law." Id. at 227.

In the decades since West Virginia became a marketable product state, courts in this district have had ample opportunity to interpret and apply the WVSCA's oil and gas precedent. Many of these decisions have addressed whether the holdings of Wellman and Tawney, involving leases with proceeds-based royalty provisions, extend to leases with another type of royalty provision. In each of these cases the Court concluded that the Wellman and Tawney requirements extend to leases containing market value-based royalty provisions. See e.g., Goodno v. Antero Resources Corp., 2020 WL 13094067 (N.D.W. Va. July 21, 2020); Cather v. EQT Production Co., 2019 WL 3806629 (N.D.W. Va. August 13, 2019); Corder v. Antero Resources Corp., 322 F. Supp. 3d 710, 719 (N.D.W.

Va. 2018); Romeo v. Antero Resources Corp., 2018 WL 4224452, *4 (N.D.W. Va. Sept. 5, 2018).

The Court of Appeals for the Fourth Circuit reached the same conclusion in Corder v. Antero Res. Corp., 57 F.4th 384, 393-94 (4th Cir. 2023). Addressing the royalty provision in a proceeds lease, the court held that the principles established in Wellman and Tawney were not limited to proceeds leases. However, Corder noted the WVSCA "has cast some doubt on whether the lessee actually is responsible for costs through the point of sale." Corder, 57 F.4th at 397 (citing Leggett v. EQT Prod. Co., 800 S.E.2d 850 (W. Va. 2017) (noting that Wellman and Tawney "muddied the point to which costs must be borne by the lessee by making reference to the 'point of sale' in [their] syllabus points.")). "[T]he Kellam court did not assess the 'point of sale' approach in any depth," either. Id.

Thus, applying West Virginia law, courts have consistently held that a lessor may be required to bear a portion of the post-production costs incurred in rendering the oil and gas marketable when the lease contains a market value or a proceeds-based royalty provision. However, West Virginia law has not yet made it known whether the duty of marketability extends only to the first available market, or whether the first marketable product rule extends to NGLs. Neither the WVSCA or courts in this district

have addressed whether marketable product rule extends to NGLs or whether the Wellman and Tawney requirements extend beyond the "first available market."

Therefore, the Court concludes that there is no controlling decision, constitutional provision, or statute on either question to be certified and the second prong of the UCQLA is satisfied. Morningstar, 253 S.E.2d at 669. Given that the substantive law governing this case is unclear, certification of these questions will further the purpose of the UCQLA by providing this Court with the benefit of West Virginia's highest court's definitive resolution of the questions presented. Abrams, 263 S.E.2d at 106.

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Antero's motion to certify and **CERTIFIES** the following questions to the Supreme Court of Appeals of West Virginia by subsequent "Order of Certification":

1) Do the requirements of Wellman v. Energy Resources, Inc., 557 S.E.2d 254 (W. Va. 2001) and Estate of Tawney v. Columbia Natural Resources, 633 S.E.2d 22 (W. Va. 2006), extend only to the "first available market" as opposed to the "point of sale" when the duty to market is implicated?

2) Does the first marketable product rule extend beyond gas to require a lessee to pay royalties on natural gas liquids ("NGLs"), and if it does, do the lessors share in the cost of processing, manufacturing, and transporting the NGLs to sale?

**MEMORANDUM OPINION AND ORDER GRANTING MOTION TO CERTIFY**

It is so **ORDERED**.

The Clerk is **DIRECTED** to transmit copies of this Memorandum Opinion and Order to counsel of record.

**DATED:** October 10, 2023

*[signature: Tom S Kleeh]*

THOMAS S. KLEEH, CHIEF JUDGE
NORTHERN DISTRICT OF WEST VIRGINIA