**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**JACKLIN ROMEO et al.,**

**Plaintiffs,**

**v.** **CIVIL NO. 1:17-CV-88 (KLEEH)**

**ANTERO RESOURCES CORPORATION,**

**Defendant.**

# MEMORANDUM OPINION AND ORDER GRANTING CLASS MEMBERS' PARTIAL MOTION FOR SUMMARY JUDGMENT ON BREACH OF CONTRACT CLAIMS [ECF NO. 503]

Pending is the *Class Members' Motion for Partial Summary Judgment on Their Breach of Contract Claims* [ECF No. 503]. For the reasons discussed herein, the motion is **GRANTED**.

## I. PROCEDURAL HISTORY

On October 2, 2017, the plaintiffs, Jacklin Romeo, Susan S. Rine, and Debra Snyder Miller, individually and on behalf of all others similarly situated (together, "Plaintiffs"), filed a second amended class action complaint, asserting one breach of contract claim against the Defendant, Antero Resources Corporation ("Antero"). See ECF No. 31. Plaintiff Romeo claims to own an interest in an oil and gas lease dated March 14, 1984, between lessors Jessie J. Nixon, Betty Nixon, Mary Alice Vincent, and Hubert L. Vincent and lessee Clarence W. Mutschelknaus. Id. ¶ 20. The "Mutschelknaus" royalty provision states,

> In consideration of the premises, the said party of the second part [Lessee] covenants and agrees: . . . to pay monthly Lessors' proportionate share of the one-eighth (1/8th) of the value at the well of the gas from each and every gas well drilled on said premises, the product from which is marketed and used off the premises, said gas to be measured at a meter set on the farm, and to pay monthly Lessors' proportionate share of the one-eighth (1/8th) of the net value at the factory of the gasoline and other gasoline products manufactured from casinghead gas.

Id. at Exh. 1. Plaintiffs Rine and Miller claim to own interests in an oil and gas lease dated October 19, 1979, between lessors Lee H. Snyder and Olive W. Snyder and lessee Robert L. Matthey, Jr. Id. ¶ 22. The "Matthey" royalty provision states,

> Lessee covenants and agrees to pay Lessor as royalty for the native gas from each and every well drilled on said premises producing native gas, an amount equal to one-eighth (1/8) of the gross proceeds received from the sale of same at the prevailing price for gas sold at the well, for all native gas saved and marketed from the said premises, payable quarterly.

Id. at Exh. 2.

On March 23, 2020, the Court certified a class of individuals and entities to whom Antero paid royalties pursuant to leases containing operative royalty provisions with identical language to the Mutschelknaus and Matthey leases. See ECF No. 152. Specifically, the Court defined the class as follows:

> Persons and entities, including their respective successors and assigns, to whom Antero has paid royalties ("Royalties") on Natural Gas, including natural gas liquids, produced by Antero from wells located in West Virginia at any time since January 1, 2009, pursuant to Leases which contain either of the following gas royalty provisions: (a) [Lessee] covenants and agrees "to pay monthly Lessors' proportionate share of the one-eighth (1/8) of the value at the well of the gas from each and every gas well drilled on said premises, the product from which is marketed and used off the premises, said gas to be measured at a meter set on the farm"; or (b) "Lessee covenants and agrees to pay Lessor as royalty for the native gas from each and every well drilled on said premised [sic] producing native gas, as amount equal to one-eighth (1/8) of the gross proceeds received from the sale of the same at the prevailing price for gas sold at the well, for all native gas saved and marketed from the said premises, payable quarterly."
>
> The Class excludes: (1) agencies, departments, or instrumentalities of the United States of America; (2) publicly traded oil and gas exploration companies; (3) any person who is or has been a working interest owner in a well produced by Antero in West Virginia; and (4) Antero.

Id. at 42-43. The Court further excluded from the class "any royalty interest owner who has never had their royalty payments reduced by Antero for their related share of post-production expenses" and "any person involved in related litigation, pursuing

the same claim, against the same defendant based on the same facts and circumstances." Id. at 43.

On June 11, 2025, the Supreme Court of Appeals of West Virginia ("SCAWV") answered certified questions relating to this case. See Romeo v. Antero Res. Corp., 917 S.E.2d 26 (W. Va. June 11, 2025). Plaintiffs then filed a motion for partial summary judgment with respect to their breach of contract claims. See ECF No. 439. On March 31, 2026, the Court denied the motion pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, relying on Antero's representations that it did not have sufficient time to cross-examine Plaintiffs' damages expert or investigate his report. See ECF No. 497. On April 16, 2026, Plaintiffs renewed their motion.[1] See ECF No. 503. It is now fully briefed and ripe for review.

## II. STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the

[1] Antero has now had the opportunity to cross-examine Plaintiffs' damages expert. See Motion, ECF No. 503, at ¶ 2.

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). The burden then shifts to the nonmoving party to present "specific facts showing that there is a genuine issue for trial." Blair v. Defender Servs., Inc., 386 F.3d 623, 625 (4th Cir. 2004) (citations omitted).

"When the moving party has carried its burden . . . , its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (citations omitted). Rather, the Court must ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251–52 (1986). At its core, the summary-judgment process examines whether a trial is needed. See id. at 250. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita, 475 U.S. at 587 (citation and internal quotation marks omitted).

## III. LEGAL BACKGROUND

Under West Virginia law, "[i]f an oil and gas lease provides for a royalty based on proceeds received by the lessee, unless the lease provides otherwise, the lessee must bear all costs incurred in exploring for, producing, marketing, and transporting the product to the point of sale." Syl. Pt. 4, Wellman v. Energy Res., Inc., 557 S.E.2d 254 (W. Va. 2001). The SCAWV has addressed three requirements that permit a lessee to deduct postproduction expenses in its payment of a lessor's royalties:

> Language in an oil and gas lease that is intended to allocate between the lessor and lessee the costs of marketing the product and transporting it to the point of sale must (1) expressly provide that the lessor shall bear some part of the costs incurred between the wellhead and the point of sale, (2) identify with particularity the specific deductions the lessee intends to take from the lessor's royalty (usually 1/8), and (3) indicate the method of calculating the amount to be deducted from the royalty for such post-production costs.

Syl. Pt. 10, Estate of Tawney v. Columbia Nat'l Res., L.L.C., 633 S.E.2d 22 (W. Va. 2006) (numbering added). When answering the certified questions in this case, the SCAWV held that "[e]xcept as may be specifically provided by the parties' agreement, where an oil and gas lease contains an express or implied duty to market," the requirements of Wellman and Tawney "extend to the point of

sale, not just to the point of marketability or to the first available market." Syl. Pt. 3, Romeo, 917 S.E.2d 26. It also held that "[e]xcept as may be specifically provided by the parties' agreement, royalties are payable to the mineral owner/lessor not only from the producer/lessee's sale of wet gas and residue gas but also from the lessee's sale of any byproducts of the wet gas such as natural gas liquids." Id. at Syl. Pt. 4. Specifically, the court held that Wellman and Tawney apply to the Mutschelknaus and Matthew royalty provisions in the class leases. See id. at 38. The SCAWV then found that the Mutschelknaus and Matthey class leases are "completely silent with respect to whether, when, and how postproduction costs may be deducted from the royalties" and, therefore, "fail" the Tawney test. Id.

## IV. PLAINTIFFS' ASSERTED FACTS

Ten of the 450 class leases contain a royalty provision modification that addresses Antero's royalty payment obligations to the lessors.

### Royalty Provision Modifications

Two class leases contain the same "No Deductions" royalty provision, which states,

> **2. No Deductions:** It is agreed between the Lessor and Lessee that, notwithstanding any language to the contrary, all oil and gas,

> including all the constituents thereof and/or associated hydrocarbons, including but not limited to: oil, gas, liquid hydrocarbons, casinghead gas, condensate, and methane gas, or other proceeds accruing to the Lessor under the Lease or by state law shall be without deduction, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil and gas, including all the constituents thereof and/or associated hydrocarbons, including but not limited to: oil, gas, liquid hydrocarbons, casinghead gas, condensate and methane gas, and other products produced hereunder to transform the product into marketable form.

Exh. 6 to Motion, at Bates No. AJR-015887; Exh. 7 to Motion, at Bates No. AJR-015893. A third class lease includes a "No Deductions" royalty provision modification that is substantially the same:

> **No Deductions:** It is agreed between the Lessor and Lessee that all oil and gas, including all the constituents thereof and/or associated hydrocarbons, including but not limited to: oil, gas, liquid hydrocarbons, casinghead gas, condensate, and methane gas, or other proceeds accruing to the Lessor under the Lease or by state law shall be without deduction, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil and gas, including all the constituents thereof and/or associated hydrocarbons, including but not limited to: oil, gas, liquid hydrocarbons, casinghead gas, condensate and methane gas,

> and other products produced hereunder to transform the product into marketable form.

Exh. 8 to Motion, at Bates No. AJR-016294.

A fourth class lease includes an "Oil and Gas Royalties" royalty provision modification, as well as a "No Deductions" royalty provision modification that is substantially the same as the "No Deductions" modifications discussed above:

> **2. <u>OIL AND GAS ROYALTIES</u>** Lessee agrees to pay as royalty each month, in the proportion that Lessor's interest bears to the whole and undivided fee: (i) a Royalty of 15% of the gross proceeds realized by Lessee from oil sold and marketed from the leased premises; and (ii) a Royalty of 15% of the gross proceeds from the gas and any constituents thereof, from the leased premises, produced and sold on or off premises, computed at the wellhead. . . .
>
> **3. <u>NO DEDUCTIONS</u>** It is agreed between the Lessor and Lessee that, all oil, gas, or other proceeds accruing to the Lessor under the Lease or by state law shall be without deduction, directly or indirectly, including but not limited to, the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder to transform the product into marketable form.

Exh. 9 to Motion, at Bates No. AJR-016270.

A fifth class lease includes two substantially identical "Gross Proceeds at Wellhead" royalty provision modifications, signed by six of the 35 lessors under the lease, which state,

> **<u>Gross Proceeds at Wellhead</u>**
> It is agreed between the Lessor and Lessee that, notwithstanding any language herein to the contrary, royalties payable on gas and gaseous substances, including casinghead gas, shall be based upon the MMBTu value of unprocessed gas at the wellhead, free of all costs, charges or deductions of producing, treating, compressing, transporting and marketing said gas to such purchaser. Notwithstanding the above, Lessor shall be responsible for whatever production taxes and/or severance taxes that may be allocable to any royalties payable on gas and gaseous substances, including casinghead gas.
>
> **<u>Gross Proceeds at Wellhead</u>**
> It is agreed between the Lessor and Lessee that, notwithstanding any language herein to the contrary, royalties payable on all hydrocarbons including gas and gaseous substances, including casinghead gas, shall be based upon the MMBTu value of unprocessed gas at the wellhead, free of all costs, charges or deductions of producing, treating, compressing, transporting and marketing said gas to such purchaser, which royalty, however, shall be subject to such production and severance taxes as are properly allocable thereto.

Exh. 10 to Motion, at Bates Nos. AJR-007888, AJR-007911, AJR-007918, AJR-007931, AJR-007936, AJR-007947.

A sixth class lease has two royalty provision modifications, including a "Market Enhancement (Gross Proceeds) Clause" signed by three of the 14 lessors under the lease, as well as a "Gross Proceeds Clause" signed by one of the lessors under the lease. The market enhancement clause states,

> **<u>Market Enhancement (Gross Proceeds) Clause</u>**
> It is agreed between the Lessor and Lessee that, notwithstanding any language herein to the contrary, all oil, gas or other proceeds accruing to the Lessor under this lease or by state law shall be without deduction, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder to transform the product into marketable form; however, any such costs which result in enhancing the value of the marketable oil, gas or other products to receive a better price may be deducted from Lessor's share of production so long as they are based on Lessee's actual cost of such enhancements. However, in no event shall Lessor receive a price that is less than, or more than, the price received by Lessee.

Exh. 11 to Motion, at Bates Nos. AJR-015900, AJR-015906. The gross proceeds clause states,

> **<u>GROSS PROCEEDS CLAUSE</u>** It is agreed between the Lessor and Lessee that, notwithstanding any language herein to the contrary, all oil, gas or other proceeds accruing to the Lessor under this Lease or by state law shall be without deduction, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating,

> compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder to transform the product into marketable form.

Id. at Bates No. AJR-015912.

Five additional leases include the same market enhancement clause. See Exh. 12 to Motion, at Bates No. AJR-008280; Exh. 13 to Motion, at Bates Nos. AJR-013546 and AJR-013550; Exh. 14 to Motion, at Bates Nos. AJR-008172, AJR-008214, AJR-008216, AJR-008218; and Exh. 15 to Motion, at Bates Nos. AJR-016239-016242. The class lease attached to Plaintiffs' motion as Exhibit 10 also includes the same market enhancement clause. See Exh. 10 to Motion, at Bates Nos. AJR-007893, AJR-007906. Thus, a total of six class leases have identical market enhancement clauses, and they were agreed to by 14 of the 1,243 class members.

**Antero's Production and Sale of Natural Gas Products Obtained From the Class Wells**

At various times since December 2009, and continuing through the present, Antero has produced natural gas from the class wells. Exh. 16 to Motion, at 39:9-42:7. The gas produced by Antero is "raw gas," which contains dry methane gas hydrocarbons. Exh. 17 to Motion, at 3. It also contains natural gas liquid hydrocarbons, which include ethane, propane, normal butane, isobutane, and natural gasoline. Id. After the raw gas emerges from the well,

it enters a gathering system, where it is commingled with gas from other wells, and it is transported to a processing plant. Id. at 3-4. At the processing plant, the natural gas liquid components of the gas are extracted from the gas and collected into a Y Grade mix of natural gas liquids. Id. at 4. The gas that remains after the natural gas liquids are extracted is commonly referred to as "residue gas." Id.

The residue gas is delivered from the processing plant into a natural gas transmission pipeline. Id. Antero sells residue gas obtained from Plaintiffs' wells to third-party purchasers at points of sale that are connected to natural gas transmission pipelines, and it has invoiced its customers for the residue gas at those points of sale. Exh. 16 to Motion, at 16:8-22:10. Antero retains title to the residue gas until the residue gas is delivered to the third-party purchasers at the point of sale. Id. at 23:15-18.

With respect to the Y Grade mix of natural gas liquids that is extracted at the processing plant, Antero transports it to a fractionation facility, where it is fractionated into identifiable natural gas liquid products, including ethane, propane, normal butane, iso-butane, and natural gasoline. Exh. 17 to Motion, at 4; Exh. 18 to Motion, at 124:17-126:18; Exh. 16 to Motion, at

47:14-48:15. Antero (or its agent) sells each of the fractionated natural gas liquid products to third-party purchasers at points of sale that are at or near the outlet of the fractionation facility. Exh. 16 to Motion, at 46:5-47:21.

**Antero's Methods of Calculating the Royalties Paid to Class Members**

Antero calculates Plaintiffs' royalties based upon monetary amounts that are less than the sale proceeds that Antero is paid at the point of sales of residue gas and natural gas liquid products. Exh. 16 to Motion, at 95:9-109:14; Exh. 19 to Motion, at 5-7; Exh. 20 to Motion, at 30:17-33:14. In Antero's calculation of Plaintiffs' royalties on its sales of residue gas, Antero deducts from the sales prices at the point of sale the cost of transporting the residue gas to the point of sale. Exh. 16 to Motion, at 95:9-109:14; Exh. 19 to Motion, at 5-7. This transportation deduction is typically described in the royalty statements sent to Plaintiffs as a "TRN3" deduction. See, e.g., Exh. 21 to Motion. In its calculation of Plaintiffs' residue gas royalty payments, Antero also deducts other postproduction expenses (including compression, third-party compression, processing plant compression, gathering, and third-party gathering) from sale proceeds. Exh. 16 to Motion, at 137:24-

158:24; Exh. 22 to Motion, at Bates Nos. AJR-012205-012245, AJR-013646-013650, AJR-013677; Exh. 23 to Motion, at Bates Nos. AJR-006883-006888, AJR-013642-013645.

In its calculation of royalties paid to Plaintiffs on the sales of natural gas liquids, Antero utilizes different methods. See Exh. 19 to Motion, at 5–7; Exh. 20 to Motion, at 11:1–12:16. Under one method, commonly described as the postproduction cost deduction method, Antero's natural gas liquids royalty payment calculations begin with the sale proceeds received by Antero (or its agent) at the point of sale, and Antero then deducts from the sale proceeds various costs related to processing, transporting, and fractionating the natural gas liquids. Exh. 19 to Motion, at 5–7; Exh. 20 to Motion, at 11:1–12:16; Exh. 24 to Motion, at Exh. A.

The second method is commonly referred to as the "shrink value method." Exh. 19 to Motion, at 5–7; Exh. 20 to Motion, at 23:13–25:5. Using the shrink value method, Antero calculates the volume of natural gas produced from the class wells which is equivalent to the amount of natural gas liquid hydrocarbons produced from the class wells, calculated on a per MMBTu basis, which is then multiplied by a weighted average sales price related to the sale of residue gas. Exh. 20 to Motion, at 25:6–28:4. In making the

shrink value calculation, Antero does not consider the sale proceeds that it has received at the point of its sales of natural gas liquids to third-party purchasers. Exh. 19 to Motion, at 5–7; Exh. 20 to Motion, at 25:6–30:15. The royalties paid to Plaintiffs under the shrink value method have been less than the royalties that Plaintiffs would have received if they had been paid based upon the sale proceeds received by Antero at the point of its sales of natural gas liquids products to third-party purchasers. Exh. 20 to Motion, at 29:3–33:14.

In instances when MarkWest Liberty Midstream & Resources, L.L.C. ("MarkWest"), in its capacity as Antero's agent, has sold Antero's fractionated natural gas liquid products obtained from the class wells pursuant to an agreement with Antero (Exh. 25 to Motion), MarkWest has consistently remitted to Antero a net sales price, which consists of the sale proceeds MarkWest has received on its sales of Antero's natural gas liquid products at the point of sale, less various fees that MarkWest is permitted to deduct under the agreement (including fees described by Plaintiffs' damages expert in Paragraph 25 of his sixth supplemental report). See Exh. 24 to Motion, at ¶ 25. With respect to such natural gas liquid product sales, Antero, in its calculation of Plaintiffs' royalties, utilizes the net monetary amount that it has received

from MarkWest as the starting point for its calculation, as opposed to the gross revenues received by MarkWest at the point of its sales of the natural gas liquids obtained from the class wells. Exh. 18 to Motion, at 125:4-126:15; Exh. 16 to Motion, at 56:10-69:15; Exh. 24 to Motion, at ¶¶ 27-30. On such natural gas liquid sales, Antero also deducts other fees, primarily consisting of fees related to processing the natural gas liquids obtained from the class wells. Exh. 24 to Motion, at ¶¶ 27-30. Thus, in Antero's calculation of royalties paid to Plaintiffs on its sales of the natural gas liquid products obtained from the class wells, Antero has paid Plaintiffs royalties that are less than the royalties they would have received if Antero had paid them based upon the natural gas liquids sale proceeds received at the point of sale by Antero or its agent. Exh. 25 to Motion, at 5-6; Exh. 20 to Motion, at 30:16-34:9; Exh. 19 to Motion, at 5-7.

## V. DISCUSSION

Plaintiffs have moved for partial summary judgment on their breach of contract claims. They assert that Antero has breached its royalty payment obligations to the 1,243 class members under the 450 class leases. In response, Antero focuses the bulk of its argument on the sufficiency of Plaintiffs' damages expert's sixth supplement to his report. Antero also relies on arguments within

its motion for clarification, which the Court denied on June 22, 2026. See ECF No. 588. Finally, Antero asserts that it does not uniformly market gas and pay royalties, and it argues that summary judgment is not appropriate for certain leases containing modifications.

As a preliminary matter, as Plaintiffs point out, the Court has already rejected Antero's argument that class leases with royalty provision modifications should not be included in the certified class. Judge Keeley previously considered and rejected this argument in certifying the class. See ECF No. 152. She considered and rejected it again when Antero filed a motion to amend the class definition. See Transcr., ECF No. 198, at 47:14–48:17. Finally, the Court more recently rejected it in its *Order Denying Motion for Clarification*. See ECF No. 588. The defined class includes leases that contain either the Mutschelknaus gas royalty provision or the Matthey gas royalty provision, without regard to whether such leases also contain royalty provision modifications. See ECF No. 152, at 42–43.

It is well established under West Virginia law that "[a] claim for breach of contract requires proof of the formation of a contract, a breach of the terms of that contract, and resulting damages." Birchfield v. Zen's Dev., LLC, 857 S.E.2d 422, 430 (W.

Va. 2021) (citation omitted). Here, it is undisputed that the class leases constitute contracts, so the first element is satisfied. As discussed below, the Court further finds that Plaintiffs have established Antero's breach of the terms of those contracts, resulting in at least some damages. There is no genuine dispute as to any material fact relating to these elements, and Plaintiffs are entitled to judgment as a matter of law on their breach of contract claims.

**A. Element Two: Breach**

For the reasons discussed below, with respect to its alleged breach of the class leases, Antero has not produced facts showing that there is a genuine issue for trial, and Plaintiffs are entitled to judgment as a matter of law.

**1. Antero has unlawfully deducted postproduction expenses from Plaintiffs' royalty payments.**

In their motion, Plaintiffs assert and produce evidence that Antero has unlawfully deducted postproduction expenses from Plaintiffs' residue gas royalty payments, including expenses for transportation to the point of sale, compression, third-party compression, processing plant compression, gathering, and third party gathering. They assert and produce evidence that Antero unlawfully deducted postproduction expenses from Plaintiffs'

natural gas liquids royalty payments, including expenses for processing, transportation to the fractionation facility, fractionation of the Y-Grade mix of the natural gas liquids, freight fees, storage fees, and prepaid sales margin fees. In addition, Plaintiffs assert and produce evidence that Antero has effectively deducted monetary amounts from their natural gas liquids royalty payments by utilizing the shrink value method, which has resulted in lower royalty payments than Plaintiffs would have received if their royalty payments had been correctly based on the proceeds received by Antero at the point of its sales of the natural gas liquids products.

In response, Antero asserts that it "does not process all gas produced by the class wells." Resp., ECF No. 517, at 11. In support, it cites an expert report by Kris Terry, and the report relies on the deposition of Alvyn Schopp ("Schopp"). Schopp testified about certain landlocked wells where the gas is not processed, but he fails to tie the landlocked wells to the class, surmising only what it would mean "if" the wells were part of the class:

> Q. Okay. And so is that then -- that would have an impact on some of the named plaintiffs and some of the class members in this case?

> A. If they were — if there was a well in there that had that, then they would get — that well would get allocated whatever got sold to Dominion back to that well.

Id. at Exh. H (Schopp Dep.) to Exh. D (Terry Report), at 101:2-102:23. Antero then discusses other wells where it sells unprocessed dry gas at the interconnect to the interstate transmission lines, but it again fails to connect the wells to the class. See id. at Exh. D (Terry Report), at ¶¶ 43, 53. Last, Antero discusses wells that are specifically tied to certain Plaintiffs, where the gas is "sometimes processed for the recovery of NGLs and other times not processed," stating that when the gas is processed, Antero sells it at various locations. See id. at ¶ 50. Processing the gas sometimes, and deducting related expenses, would constitute a breach. Moreover, the SCAWV has recognized that the wet gas produced by Antero from the class wells has been (1) sold by Antero as unprocessed gas "at or near the wellhead," or (2) "delivered into a gathering system where it is sold upon entry into an interstate transmission line," or (3) sold by Antero after delivery of the wet gas into a processing plant for processing, where the residue gas is then sold "at the tailgate of the processing plant" or (4) "at local sales locations" or (5) "at distant locations such as Chicago, Illinois, Detroit, Michigan

and the Gulf Coast." Romeo, 917 S.E.2d at 30-31. These statements confirm that the fact that natural gas and natural gas liquids are not uniformly sold at a single downstream location does not affect Antero's obligation to pay Plaintiffs royalties based upon the proceeds Antero has received at the points of its sales of the natural gas products and natural gas liquids products, including unprocessed gas. Id. at 37-39. Antero has not created a genuine issue of material fact with respect to the way that Antero sells its natural gas products and natural gas liquid products.

**2. Modifications to the class leases do not defeat summary judgment.**

Antero asserts that, even if the Court finds that modified leases may remain in the class (which it has), the modifications preclude summary judgment. The Court disagrees and will discuss each type of modification in turn.

**a. "No Deductions," "Oil and Gas Royalties," "Gross Proceeds," and "Gross Proceeds at Wellhead" Royalty Provision Modifications**

As discussed above, six of the class leases have royalty provision modifications that include one or more of the following provisions: (1) "No Deductions," (2) "Oil and Gas Royalties," (3) "Gross Proceeds," and (4) "Gross Proceeds At Wellhead." Upon review, the Court agrees with Plaintiffs that these modifications

do not satisfy Tawney's three requirements. See Syl. Pt. 10, Tawney, 633 S.E.2d 22. The modifications do not "expressly provide that the lessor shall bear some part of the costs incurred [by the lessee] between the wellhead and the point of sale[.]" Id. They do not "identify with particularity the specific deductions the lessee intends to take from the lessor's royalty. . . ." Id. Finally, they do not "indicate the method of calculating the amount to be deducted from the royalty for such post-production costs."[2] Id. To the contrary, each of the modifications specifically states that deductions are not permitted. The "No Deductions" modification states that all gas proceeds "shall be without deduction[.] . . ." Exh. 6 to Motion, at Bates No. AJR-015887; Exh. 7 to Motion, at Bates No. AJR-015893. The lease modified by "Oil and Gas Royalties" also contains a "No Deductions" modification. Exh. 9 to Motion, at Bates No. AJR-016270. The "Gross Proceeds" clause states that all gas proceeds "shall be without deduction[.] . . ." Id. at Bates No. AJR-015912. The "Gross Proceeds at Wellhead"[3] clause states that "royalties payable on gas . . . shall be . . .free of all costs, charges or

[2] The "Gross Proceeds At Wellhead" royalty provision modification does state that "the lessor shall be responsible for production taxes and/or severance taxes that may be allocable to any royalties," but these taxes are not costs incurred between the wellhead and the point of sale.
[3] Antero refers to this as "leases requiring payment on Wellhead MMBTu Value."

deductions . . . ." Exh. 10 to Motion, at Bates Nos. AJR-007888, AJR-007911, AJR-007918, AJR-007931, AJR-007936, AJR-007947. Accordingly, the modifications to these six leases do not change the fact that Antero is not permitted to deduct postproduction expenses and do not preclude summary judgment with respect to the applicable leases.

**b. Market Enhancement Clauses**

As discussed above, six leases have been modified by a market enhancement clause. The royalty provision found in the market enhancement clause is identical to the market enhancement clause addressed in Corder v. Antero Resources Corporation, in which the United States Court of Appeals for the Fourth Circuit held that the clause "satisfies Tawney and has a plain, unambiguous meaning: when Antero pays royalties from the sale of a particular product, it may deduct actual and reasonable costs it incurred after that product became fit for sale, as long as those costs enhanced the value of the product." See Corder v. Antero Res. Corp., 57 F.4th 384, 401 (4th Cir. 2023).

Plaintiffs argue that the second sentence of the Market Enhancement Clause ("However, in no event shall Lessor receive a price that is less than, or more than, the price received by Lessee") means that Antero is obligated to pay royalties to the

affected Plaintiffs based upon the price received by Antero for the sale of residue gas and natural gas liquids obtained from Plaintiffs' wells, which is the same royalty payment obligation that Antero has to Plaintiffs under the Mutschelknaus and Matthey gas royalty provisions. Plaintiffs argue that the Fourth Circuit did not analyze the second sentence, and, therefore, the market enhancement clause here does not change Antero's royalty payment obligations to Plaintiffs. Antero, on the other hand, asserts that the Fourth Circuit reviewed the market enhancement clause in full.

The Court has reviewed the Corder decision and agrees with Plaintiffs' representation that the Fourth Circuit quoted the second sentence but did not interpret it. Because the meaning of the second sentence was not squarely presented before the Fourth Circuit, the Corder decision does not preclude Plaintiffs' reliance on the second sentence here.[4] See Loper Bright Enter. v. Raimondo, 603 U.S. 369, 426 (2024) (Gorsuch, J., concurring) ("[W]hen judges reach a decision in our adversarial system, they render a judgment based only on the factual record and legal arguments the parties at hand have chosen to develop. A later

[4] Moreover, even if the second sentence were squarely presented to the Fourth Circuit, the Fourth Circuit's interpretation of the clause — applying West Virginia contract law — is not binding here.

court assessing a past decision must therefore appreciate the possibility that different facts and different legal arguments may dictate a different outcome.”).

Moreover, the first sentence of the market enhancement clause specifically prohibits postproduction deductions of costs unless the costs relate to enhancing the value of the gas or other products to receive a better price. Here, Antero has presented no evidence or argument indicating that it enhanced the value of the gas. Postproduction deductions for the cost of “producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products . . . to transform the product into marketable form” remain prohibited under the market enhancement clause. See Exh. 11 to Motion, at Bates Nos. AJR-015900, AJR-015906. Accordingly, the market enhancement clause found in six of the class leases does not change Antero's obligations under the leases and does not defeat summary judgment.

**c. Leases Requiring Payment on Index Value**

Antero cites another lease modification requiring payment on index value, arguing that the modifications preclude summary judgment. See Exh. 28 to Motion, at Bates AJR-007712-007714, AJR-007706-007711. Plaintiffs contend that Antero ignores a

controlling sentence in the modification. The last sentence of the first paragraph of the index price lease modification states, "This modification is applicable only to wells that receive a percentage or fractional royalty for natural gas based on volume." Id. at Bates Nos. AJR-007706-007711. The class wells do not "receive a percentage or fractional royalty for natural gas based on volume." Rather, the Mutschelknaus royalty provision is based upon a percentage of the "value at the well of the gas from each and every gas well drilled on said premises . . . ." Id. at Bates No. AJR-00712. The Court agrees with Plaintiffs that the index price modification does not change Antero's obligations and does not preclude summary judgment.

**d. Leases Requiring Payment on Net Proceeds**

Antero asserts that eight leases were modified to require payment on net proceeds. See Resp., ECF No. 517, at 16 n.6. It argues that these modifications expressly permit Antero to deduct marketing, compression, gathering, processing, and transportation costs from royalties and, accordingly, satisfy Tawney. It argues that the Court should deny summary judgment to Plaintiffs on the merits for these leases because they require individualized analyses. In reply, Plaintiffs state that the leases are not class leases, are not class lease modifications, and have no factual or

legal relevance to any of the class leases or class lease modifications. The eight net proceeds leases referenced by Antero do not contain either the Mutschelknaus or Matthey provision but instead include only the net proceeds royalty provision cited by Antero. Based on Plaintiffs' representation that the net proceeds leases are not part of the class, the Court finds that Antero's argument does not preclude summary judgment.

For all of these reasons, as a matter of law, the Court finds that Antero breached its contracts with Plaintiffs, and the second element of their breach of contract claims is satisfied.

**B. Element Three: Damages**

Plaintiffs' damages expert, Donald A. Phend, CPA ("Phend"), has determined that Antero has underpaid the amount of royalties owed to each of the 1,243 class members. Plaintiffs have submitted Phend's calculation of royalty underpayments solely for the purpose of establishing that all class members have sustained some amount of underpayment, thus satisfying the third element of a breach of contract claim. See Exh. 24 to Motion, at Exh. A. Phend has calculated the monthly amount of royalties that Antero would have paid to each class member if Antero had paid each class member based upon the prices received by Antero (or its agent) at the point of sales of residue gas and natural gas liquids, and then

subtracted the amount that Antero did pay to each class member, to determine the principal amount of each class member's monthly royalty underpayments. See id. at ¶ 15. Phend's damages calculation follows the applicable West Virginia law regarding the measure of damages in a breach of contract case. Miller v. WesBanco Bank, Inc., 859 S.E.2d 306, 335 (W. Va. 2021) ("[I]t is a fundamental principle of the law of contracts that a plaintiff is only entitled to such damages as would put him in the same position as if the contract had been performed.") (citations omitted).

Antero argues that Phend's sixth supplemental report is insufficient to carry Plaintiffs' burden because (1) Plaintiffs have since supplanted it with materially different analyses, (2) it is methodologically flawed, and (3) it rests on disputed and incorrect factual assumptions. Importantly, Antero does not argue or submit evidence that any Plaintiffs did not sustain some amount of royalty underpayments as a result of Antero's breaches of its royalty obligations. To the extent that Antero argues that Plaintiffs' motion relies on "evolving and disputed expert analyses," the Court rejects this argument as a basis for denying summary judgment. The fact that Phend may be periodically updating his calculations does not change the undisputed fact that damages

exist for each class member. Upon review of the record, there is no genuine dispute as to any material fact regarding the existence of damages. The amount of damages, of course, is disputed, and will be adjudicated at a later date.

For these reasons, the Court finds that Plaintiffs have satisfied the third element of their breach of contract claim: that they suffered damages. Overall, Plaintiffs have satisfied all three elements of their breach of contract claim, there are no genuine disputes of material fact, and Plaintiffs are entitled to judgment as a matter of law.

## VI. CONCLUSION

For the reasons discussed above, the *Class Members' Motion for Partial Summary Judgment on Their Breach of Contract Claims* [ECF No. 503] is **GRANTED.** Plaintiffs are entitled to judgment as a matter of law on their breach of contract claims. The parties are **DIRECTED** to meet and confer and, on or before **November 24, 2026**, submit a proposed schedule to govern the damages phase of the case.

It is so **ORDERED.**

The Clerk is directed to transmit copies of this Memorandum Opinion and Order to counsel of record.

DATED: November 17, 2026

Tom S Kleeh

THOMAS S. KLEEH, CHIEF JUDGE
NORTHERN DISTRICT OF WEST VIRGINIA